**In the Matter of the ADOPTION OF BERNARD A.**

No. S–10771.

Supreme Court of Alaska.

Sept. 12, 2003.

Michael J. Walleri, Law Offices of Michael J. Walleri, Fairbanks, for Appellants.

Brooks W. Chandler, Hicks, Boyd, Chandler & Falconer, LLP, Anchorage, for Appellees.

Before: FABE, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

1. We use pseudonyms to protect the privacy of family members involved in this case.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A grandfather and grandmother appeal the decision of the superior court denying their petition for adoption of their grandson and granting the adoption petition of the child's foster parents. They claim that the superior court placed undue emphasis on the length of time that the three-year-old child had spent in the care of his foster parents. We hold that there was no abuse of discretion; accordingly, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

Bernard A.,[1] the child at the center of the current dispute, was born in January 1999 and was removed from his parents by the Division of Family and Youth Services (DFYS) in August 1999. Bernard is the fifth of Linda G.'s six children. With the possible exception of an additional seventh child with which Linda was pregnant at the time of the superior court hearing, about which we have no further information, none of these children is in Linda's custody. Although appellants Constance and Clark L., Linda's mother and stepfather, immediately asked that Bernard be placed with them when he was removed from his parents' custody in August 1999, Bernard was instead placed in foster care with appellees Ruth K. and John A. He has lived with Ruth and John ever since. The parental rights of Linda and Bernard's father were terminated in April 2001 due to abandonment, substance abuse, and neglect, at which time both parents expressed a preference that the child be placed for adoption with Constance and Clark.

We reviewed the termination of Linda's parental rights to two of her children, J.G. and S.G., in 2000 in *L.G. v. State, Department of Health & Social Services*.[2] S.G. was eventually placed for adoption with Ruth and John, who were among her several foster

2. 14 P.3d 946 (Alaska 2000).

placements.[3] Constance and Clark had wished to adopt both girls themselves, and appealed the superior court's decision granting adoption of both girls to their respective foster parents in *C.L. & C.L. v. P.C.S.*, but were unsuccessful.[4] These decisions were based in part on several incidents that showed that Constance and Clark lacked understanding of the psychological needs of these children: in 1994 Constance and Clark decided they could no longer cope with having two-year-old J.G. placed with them on a foster care basis and simply had her dropped off at the DFYS office without warning to DFYS or to J.G.;[5] there was evidence that DFYS workers had encountered Constance in states of intoxication in the mid–1990's, prior to the girls' adoptions, even though this was traumatic for J.G. given her history with her mother (at least one of these occasions was when J.G. was brought in for a visit);[6] and Constance and Clark had in the past given Linda access to the children in contravention of DFYS instructions after this proved traumatic for J.G.[7] Constance and Clark did later obtain custody of Linda's sixth child, K.G., and were in the process of adopting him at the time of the hearing in the current case.

Linda and her mother, Constance, are affiliated with the Yup'ik village of Emmonak; Bernard's father had no tribal affiliation. Bernard is eligible for tribal affiliation through his mother and is therefore an "Indian child" under the Indian Child Welfare Act (ICWA).[8] Clark has no tribal affiliation. John is a Yup'ik and Inupiat affiliated with the village of Kotlik. Ruth is a Yup'ik affiliated with the village of Emmonak. We held in *C.L. & C.L. v. P.C.S.* that Ruth qualified for the extended family placement preference[9] for Linda's children because of evidence that Yup'ik tradition considers a second cousin once removed to be extended family under 25 U.S.C. § 1903(2).[10] In addition, John also presented evidence in this case that his older brother was married to one of Constance's cousins.

### B. Proceedings

Constance and Clark filed various amended petitions to adopt Bernard in February and June 2001; Ruth and John filed petitions to adopt Bernard in June and August 2001 after parental rights were terminated in April 2001. The village government of Emmonak was contacted, and it expressed no opinion as to where Bernard should be placed. DFYS had legal custody of Bernard because he was a child in need of aid, and consented to Ruth and John's petition. Constance and Clark finally submitted the last of the documentation supporting their petition at the end of September 2001, and asked for a rescheduling of the hearing on their petition, which was granted for November 2001. After a similar hearing on Ruth and John's petition in November 2001, a special master recommended in December 2001 that the two adoption petitions be consolidated. Separately, Constance and Clark also filed a motion to consolidate, and that motion was later granted. The superior court accepted the special master's recommendation to consolidate in January 2002, and hearings on the best interests of the child were held before Special Master Alicemary L. Closuit on Feb-

**3.** *Id.* at 948–49; *C.L. & C.L. v. P.C.S.*, 17 P.3d 769, 771 (Alaska 2001).

**4.** 17 P.3d at 771.

**5.** This incident was used as a partial basis for our finding that Constance and Clark were not a suitable alternative placement for J.G. in *L.G.* 14 P.3d at 955.

**6.** This evidence was part of the reason we affirmed the superior court's finding that "the grandparents do not understand the impact on J.G. of exposure to ... alcohol consumption" in the adoption case regarding J.G. and S.G. *C.L.*, 17 P.3d at 774–75.

**7.** This evidence was part of the reason we affirmed the superior court's finding that "the grandparents do not understand the impact on J.G. of exposure to her mother" in the adoption case regarding J.G. and S.G. *Id.*

**8.** 25 U.S.C.A. § 1903(4) (West 2001).

**9.** ICWA recognizes a placement preference for members of an Indian child's extended family. 25 U.S.C.A. § 1915(a)(1) (West 2001).

**10.** 17 P.3d at 777.

ruary 28 and Special Master Daniel Weber on March 18–19, 2002.

In a lengthy report, Special Master Weber recommended in late May 2002 that Ruth and John be allowed to adopt Bernard. The primary reason for this recommendation was that several experts had testified that early childhood bonding was of "crucial importance" to a child's future emotional stability, and Bernard had lived only with Ruth and John from the ages of seven months to three years at the time of the hearing. The special master also indicated that the parenting style of Ruth and John was more likely to meet Bernard's emotional needs, in light of Constance and Clark's past behavior with J.G., including the alcohol use, unauthorized exposure to her mother, and their sudden and unceremonious renunciation of her foster care placement. The special master found that the parties were equally capable of caring for Bernard's physical and cultural needs, and that each party would provide him with differing but acceptable access to at least some of his other relatives. The special master also found that the families both satisfied the ICWA extended family placement preference under *C.L. & C.L. v. P.C.S.*,[11] but that the placement preference of the biological parents was not entitled to much weight in judging Bernard's best interests. Constance and Clark objected to the special master's report in June 2002. In July Superior Court Judge Niesje J. Steinkruger adopted the special master's report, granted Ruth and John's petition, and denied Constance and Clark's petition. The adoption decree was issued on August 2, 2002. Constance and Clark appeal.

## III. STANDARD OF REVIEW

■ An adoptive placement determination should be reversed only when the record as a whole reveals an abuse of discretion or when controlling factual findings are clearly erroneous.[12] The trial court abuses its discretion if it considers improper factors, fails to consider relevant statutory factors, or assigns disproportionate weight to some factors while ignoring others.[13] In an adoption case, the court's best interests of the child finding and other factual findings are reviewed under the "clearly erroneous" standard.[14] A finding is clearly erroneous only when a review of the entire record leaves us firmly convinced that a mistake has been made.[15]

■ We apply our independent judgment to questions of law and "adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[16]

## IV. DISCUSSION

■ The parties agree that the relevant inquiry in a contested adoption is whether the adoption is in the best interests of the child.[17] Constance and Clark argue that the superior court abused its discretion by over-emphasizing the length of time that Bernard had spent with his foster parents and by deprecating other factors they argue weigh in their favor. We reject these arguments.

### A. The Trial Court Properly Considered the Length of Time Bernard Spent with his Foster Parents.

■ Constance and Clark argue that the special master assigned too much weight to the length of time Bernard had spent with Ruth and John, thereby ignoring Bernard's bonds with Constance and Clark as well as several other factors which will be discussed below in Part IV.B. They claim that this contravenes our holding in *In re A.S.* that "no single factor should be allowed to outweigh all others in applying the 'best interests of the child' standard."[18] Constance and Clark also claim that the superior court

11. *C.L.*, 17 P.3d at 777.

12. *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000).

13. *West v. West*, 21 P.3d 838, 841 (Alaska 2001).

14. *In re J.J.J.*, 718 P.2d 948, 957 (Alaska 1986).

15. *West*, 21 P.3d at 841.

16. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

17. *See, e.g., In re W.E.G. & J.R.G.*, 710 P.2d 410, 417 (Alaska 1985).

18. *In re A.S.*, 740 P.2d 432, 435–36 (Alaska 1987).

should have taken more trouble to compare the quality and duration of Bernard's bond with each of the parties, as was ordered in *In re W.E.G. & J.R.G.*[19]

In *Adoption of N.P.S.*, we held that in determining the best interest of a child, "[w]hether one factor outweighs another is committed to the sound discretion of the trial court."[20] In the present case, expert witnesses testified that continuity of caregiving is very important to the happiness and emotional development of very young children and that unnecessary transfers of care should be avoided, because children can suffer dramatic emotional problems when they are not able to form stable attachments with those around them. This accords with the finding of the Alaska Legislature in AS 47.05.065(5)(C) that "it is important ... to ensure that all children, especially those under the age of six years, who have been removed from their homes are placed in permanent homes expeditiously." In his findings of fact, the special master did not ignore Constance and Clark's relationship and bond with Bernard, but simply found that even a gradual transition into their care would disrupt his life unnecessarily and possibly to his great detriment. The special master considered numerous other factors in Bernard's case, including cultural literacy and participation, ability to meet his physical needs, and access to his other relatives, and often found either that they weighed equally in favor of both parties, or that Ruth and John had performed better in the past. While it is certainly true that Bernard's continuous residence with Ruth and John for thirty of his thirty-seven months by March 2002, the end of trial, appears to have been the most significant factor in this case, it is hardly an abuse

of discretion to find that among several factors, many of which weigh equally between the parties, one takes on the most importance. This does not amount to a "single factor ... outweigh[ing] all others in applying the 'best interests of the child' standard."[21]

Constance and Clark also argue that Bernard's continuity of care with Ruth and John results artificially from the superior court's refusal to hear their first adoption petition in February 2001 when they filed it. In effect, they imply that continuity of care should be disregarded in determining placement in this case because continuity of care resulted from the superior court's refusal to hear their first petition promptly. As a preliminary matter we must observe that a standing master of the Fairbanks Probate Office notified Constance and Clark on February 15, 2001 that their petition was incomplete because it lacked numerous supporting documents required under Alaska Adoption Rules 6, 8, 9, and 10; AS 18.50.510; AS 25.23.040, .060, .080, .090, .100, .170, and .185; and 25 U.S.C. §§ 1912–1913. Constance and Clark did not file the last of these documents until September 27, 2001, and the case progressed smoothly thereafter given its complexity. But we also note that even in February of 2001, Bernard had spent eighteen of his twenty-four months in the sole care of Ruth and John. It is unfortunate that an initial foster care placement of a very young child in need of aid may ripen into an adoptive placement precisely because of the need for continuity of care.[22] For this reason we encourage trial courts to expedite and dispose of adoption contests as soon as possible. But statutory law[23] and the testimony of experts

**19.** *See W.E.G.*, 710 P.2d at 416–17 (suggesting that in adoption contest between foster parents and grandparents, trial court should consider length and quality of time and bonding experienced by children with each petitioner).

**20.** *Adoption of N.P.S.*, 868 P.2d 934, 938 (Alaska 1994).

**21.** *A.S.*, 740 P.2d at 435–36.

**22.** *See* AS 47.10.088(d)(1) (providing that DFYS shall cease efforts to reunite a child in need of aid with its parents if the child has been in foster

care for fifteen of last twenty-two months) (reflecting Adoption and Safe Families Act of 1997 § 103(a)(3), 42 U.S.C.A. § 675(5)(E) (Supp. 2003)).

**23.** AS 47.05.065(5) (finding by legislature that children under six years of age who have been removed from their homes must be placed in permanent homes expeditiously because of risks of emotional damage stemming from failure to attach to adult caregiver).

relied upon in case law[24] tell us that multiple placements of very young children put them at risk of grave psychological consequences. It is the duty of the trial court to move cases expeditiously and to rule in the best interest of the child, and the perceived fairness of the result to the adults involved is necessarily of secondary, and far less, importance than the best interests of the child. As one expert in the case put it, the question is where the child's best interests lie, not which of the applicants is the most deserving.

## B. The Trial Court Properly Evaluated and Placed Sufficient Emphasis on Factors Weighing in Favor of the Grandparents.

Constance and Clark essentially argue that instead of stressing Bernard's long-term and successful care by Ruth and John, the trial court should have been persuaded by several factors that they contend weigh in their favor. We hold that the special master made no clearly erroneous factual findings against Constance and Clark, and did not abuse his discretion in declining to give certain factors more weight.

### 1. The alleged inability of Ruth and John to supervise the child safely

■ Constance and Clark contend that the special master clearly erred in rejecting evidence that Ruth and John had allowed Bernard to suffer bruising, lacerations, cuts, bite marks, toenail problems, and improperly fitted shoes while in their care. Constance testified at trial, with the aid of photographs and a videotape, that she had alerted DFYS to such problems when visiting Bernard, but that no action had been taken. The special master found that "[n]one of the marks appears to a medically untrained eye to be a significant injury" or "anything beyond ailments and minor injuries which would be ordinary in an active toddler." Having reviewed the photographic evidence, we agree with the special master that these injuries do not appear to be significant. We hold that the special master's findings on this point are not clearly erroneous.

### 2. Constance and Clark's stronger contacts with the child's biological relatives

■ Constance and Clark argue that the special master gave insufficient consideration to their ability to provide Bernard with access to his other biological relatives. They argue that in living with them, Bernard would reside with his brother, and that he would have access to relatives on both his mother's and father's sides. Ruth and John point out in reply that in their household Bernard has already lived with S.G., his half-sister, for two years. They argue that they too arrange for Bernard to spend time with his relatives, and that these are simply different relatives from the ones Constance and Clark know. The record supports the contention that Constance and Clark can provide Bernard with access to more of his extended family, especially relatives from his deceased father's side. Nonetheless, Ruth and John can provide adequate exposure to the extended family, and we agree with the superior court that Bernard's daily care is even more important than his contacts with his extended family.

Constance and Clark also submit that because the extended family placement preference of the ICWA[25] is meant to reverse a pattern of breaking up Indian families and to promote the stability of Indian families,[26] this factor should be given no inconsiderable weight. Ruth and John argue that they themselves are part of Bernard's extended family and that placement with them does not "break up" an Indian family any more than has already occurred. In the previous case between these parties, we held that Ruth provides a sufficiently close family relationship to meet the purpose of the ICWA

24. See, e.g., J.H. v. State, Dep't of Health & Soc. Servs., 30 P.3d 79, 87 n. 14 (Alaska 2001); M.W. v. State, Dep't of Health & Soc. Servs., 20 P.3d 1141, 1147 (Alaska 2001); L.G. v. State, Dep't of Health & Soc. Servs., 14 P.3d 946, 951 (Alaska 2000).

25. 25 U.S.C.A. § 1915(a) (West 2001).

26. 25 U.S.C.A. §§ 1901(4)-(5), 1902 (West 2001).

extended family placement preference,[27] and that Constance and Clark had not shown that they have any greater claim under Yup'ik tradition to the ICWA extended family placement preference by virtue of being more closely related by blood.[28] They produced no new evidence on Yup'ik tradition in the current trial. Accordingly, we hold that the trial court did not abuse its discretion on this point.

### 3. The preference of the child's biological parents

▇ Constance and Clark also contend that the trial court attached insufficient weight to the placement preference of the biological parents. They argue that parental preference is an ICWA factor that has previously been given effect by this court in *Adoption of N.P.S.*[29] and *In re Adoption of F.H.*,[30] but that in those cases the parental preference resulted in the placement of Indian children with non-Indian parents, which they argue cannot be consistent with the purposes of the ICWA. Ruth and John contend that the ICWA states that parental preference is to be considered "[w]here appropriate"[31] and that Linda's preference was properly given less weight because Linda was a "demonstrably incompetent parent with little history of genuine concern for her children's care." A DFYS investigator had testified that Linda had "really put [her older] children into emotional turmoil" when she told them that she would regain their custody and take them away from their foster parents. This allegedly occurred when Constance and Clark allowed Linda to have "unauthorized contact" with the children. Constance and Clark reply that we have previously held that the fact of the preference is more significant than the reasoning behind it under the ICWA,[32] and that it is factually unfounded to say that they will give Linda improper access to the children in the future.

We agree with the special master that in this case, parental preference does not shed light on what the best living situation for Bernard is and should not overcome the importance of continuity of care. Moreover, Constance and Clark's argument about a policy of ratifying the parental preference only for non-Indian placements is irrelevant to this case, because both parties include a partner who shares Bernard's tribal affiliation. We find no abuse of discretion on this point.

### 4. The comparative stability of the parties

▇ Constance and Clark also make a number of arguments addressing the "stability" of the two households, which is a best-interest factor under *McDanold v. McDanold*.[33] They first contend that their household is more stable because both of them are retired,[34] whereas John travels frequently on business.[35] Constance and Clark also contend that they have no alcohol problems,[36] whereas in the past John has admitted to alcohol dependency. Constance and Clark also argue that they have never given up prior children for adoption, whereas both Ruth and John have. Ruth and John con-

27. *C.L. & C.L. v. P.C.S.*, 17 P.3d 769, 777 (Alaska 2001).

28. *Id.*

29. 868 P.2d 934, 937 (Alaska 1994) (honoring parental preference for placement of child with mother's non-Indian partner).

30. 851 P.2d 1361, 1364–65 (Alaska 1993) (honoring parental preference for placement of child with non-Indian foster parents).

31. 25 U.S.C.A. § 1915(c) (West 2001).

32. *N.P.S.*, 868 P.2d at 937 n. 3.

33. 718 P.2d 467, 470 (Alaska 1986) (explaining that parent's past conduct may be considered where it sheds light on "current stability and parenting ability").

34. Constance has a fur and crafts business, which she runs out of her home. Clark is a retired plumber.

35. John is a biologist with the U.S. Fish and Wildlife Service.

36. Both Constance and Clark have convictions for alcohol-related offenses dating from 1987 to 1990, including two DWI's for Clark and an alcohol-related arrest of Constance for urinating in public. Constance and Clark underwent substance abuse evaluations in 2000 and no concerns were expressed.

tend that these allegations center on problems that are "decades old and completely overcome." The special master found that the adoptions of Ruth's and John's respective children were organized responsibly and do not reflect negatively on their judgment, in distinction to Constance and Clark's return of J.G. to DFYS. We agree that the placements for adoption occurred years ago and are therefore of little value as evidence of the present stability of the· household under *McDanold*. Likewise, both couples—Constance and Clark, Ruth and John—have been certified as foster parents and therefore have been cleared of present-day substance abuse problems. The special master did not err in finding that Ruth and John provide a stable household.

To the limited extent that Constance and Clark have been able to prove any of the above four factors (alleged inability to supervise the child safely, the grandparents' better access to the child's extended family, parental preference, and relative "stability"), these factors do not outweigh the superior court's finding that Bernard's emotional health would be best served by continuing his placement with Ruth and John. We hold that there was no abuse of discretion and no clear error.

## V. CONCLUSION

Because the superior court did not abuse its discretion in weighing best-interest factors or clearly err in finding that Bernard's interests were best served by granting the adoption petition of his foster parents, we AFFIRM the order of the superior court.

MATTHEWS, Justice, not participating.