In the Matter of the ADOPTION
OF S.K.L.H., a Minor Child.

No. S–12960.

Supreme Court of Alaska.

March 27, 2009.

H. Clay Keene, Blake M. Chupka, Keene & Currall, P.C., Ketchikan, for Appellants.

Michael P. Heiser, Ketchikan, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

WINFREE, Justice.

## I. INTRODUCTION

Biological parents consented to their baby's adoption and the superior court entered a final adoption decree. Six months later the biological mother petitioned to set aside the adoption decree, alleging that her consent was invalid. The superior court granted her petition, finding first that there had not been a "meeting of the minds" (which the court on reconsideration later characterized as "mistake") about the biological mother's relationship with the child after the adoption decree, and second that it was in the child's best interests to be with her biological mother.

Because we do not recognize mere mistake about post-adoption visitation as a ground to invalidate adoption consent or an adoption decree, we reverse the superior court's decision and reinstate the adoption decree. But because: (1) the adoption consent form prepared by the attorney for the adoptive parents and signed by the biological mother provided that the biological mother understood she would have the right to

visitation with the child after the adoption; (2) the findings of fact and conclusions of law prepared by the attorney for the adoptive parents and entered by the court with the adoption decree confirmed the parties' contemplated visitation rights for the biological mother following the adoption; and (3) the superior court has the authority to enforce a visitation framework in the best interests of the child, we remand with direction to consider appropriate visitation for the biological mother in this open adoption.[1]

## II. FACTS AND PROCEEDINGS

Donna[2] was barely eighteen years old when she gave birth to a baby girl in October 2006. The child's biological father was seventeen years old and resided in Iowa with no intent to move to Alaska. He is not a party to this litigation.

During her pregnancy Donna expressed an intent to give up her child for adoption. About one week before giving birth, she approached her father and stepmother (the Smiths) about adopting the child. Donna changed her mind about adoption after the child was born, and she and the child moved in with Donna's stepsister. About three weeks later Donna changed her mind again. Donna asked her stepsister and her stepsister's boyfriend to adopt the child, but they declined. Donna again approached the Smiths about adopting the child. The Smiths agreed.

The child was placed in the Smiths' care and custody on November 9, 2006. Both Donna and the biological father were re-quired to give consent before the adoption could be completed,[3] and on November 13 Donna and the Smiths met with the Smiths' attorney for Donna to review and sign her consent form. Donna was not represented by an attorney at this meeting, but before she signed her consent form the Smiths' attorney read and discussed each paragraph of the document with her.[4]

Paragraph six of Donna's consent form provided:

> I understand that, by signing this consent, I am giving up all of my rights to the care, custody and control of the minor child, and that I am giving up these rights permanently. I will also be permanently relieved of all responsibility for the child. I will have legal relationships to the child including for purposes of inheritance; and I will have full right to visitation with the child after the adoption.

Donna's consent form also provided that her consent could be withdrawn up to ten days after signing the consent form, but thereafter could be withdrawn "only upon a finding by the Court, after a hearing[,] that withdrawal of the consent is in the child's best interests."[5] It also provided that once the adoption decree was entered, consent no longer could be withdrawn "at all."[6] Donna signed the consent form that day, and it was filed with the court. Donna later contacted the child's biological father to solicit his consent to the adoption; his written consent, which was not conditioned upon maintenance of any legal relationships or visitation rights, was also filed with the court.

---

1. The term "open adoption" is used to describe the situation where there is no confidentiality between the natural parents (or siblings) and the adoptive parents or where there is some degree of contact between the child and birth family following the adoption. While the adoptive parents are still the sole legal parents, the natural parents and/or siblings may have ongoing contact with the child, ranging from an exchange of photographs and letters up to visitation rights.
 ANN M. HARALAMBIE, HANDLING CHILD CUSTODY, ABUSE AND ADOPTION CASES § 14.21 (McGraw–Hill 1993).

2. Pseudonyms are used for all family members.

3. *See* AS 25.23.040(a)(1)-(2) (consent generally required from biological mother and father of a minor child); *In re Adoption of A.F.M.*, 15 P.3d 258, 262 (Alaska 2001) (ordinarily parental consent is required for adoption, but not if the parent's relationship with the child has been terminated in an adoption or child in need of aid proceeding).

4. Paragraph three of Donna's consent provides an acknowledgment that Donna had the right to consult with her own attorney.

5. *See* AS 25.23.070(b) (setting conditions for withdrawal of consent after ten days but prior to entry of adoption decree).

6. *See* AS 25.23.070(a) (consent may not be withdrawn after entry of adoption decree).

The Smiths' attorney lodged proposed findings of fact and conclusions of law and a proposed decree. Relevant findings and conclusions were that: (1) Mr. Smith (Donna's father) was forty-nine years old and Mrs. Smith (Donna's stepmother) was nearly forty years old; (2) the Smiths had seven children other than Donna; (3) Donna voluntarily consented to the Smiths' adoption of her child; (4) Donna "shall retain visitation rights with the minor child following the adoption"; (5) all required consents had been filed or excused and all appropriate notices had been given; and (6) the adoption was in the best interests of the child. The findings and conclusions and the adoption decree were entered as presented after a brief hearing on December 18, 2006.[7]

Donna visited the child freely in the weeks following the adoption, but the Smiths then began imposing restrictions and limitations that Donna characterizes as preventing "meaningful contact" with the child. In late June 2007 Donna filed a verified petition to set aside the adoption, alleging that: (1) her consent had been "obtained by misrepresentation and/or undue influence," specifically that the Smiths "falsely stated that [Donna] could have her child back when she was ready"; (2) the Smiths had "failed to obtain [Donna's] proper consent" and "failed to give required notice of the [adoption] petition"; (3) she had not signed the consent "voluntarily, knowingly or intelligently" and had not received a copy of it as required by statute; and (4) it was "in the best interests and welfare of the minor child to have the parental relationship with [Donna] restored."

An evidentiary hearing was held on December 5 and 6, 2007. The superior court orally entered its decision to set aside the adoption on December 6. The court first noted that it had jurisdiction because the petition was filed within one year of the decree.[8] The court found that Donna's consent had not been obtained by fraud or misrepresentation because "there [was] no question" that the Smiths' attorney "did his job" making sure that Donna understood what was going on and that "he did it well." The court made no specific note or findings either of "duress" or "undue influence" affecting Donna's consent, or of any procedural infirmities during the adoption process. While not finding that Donna lacked capacity when she signed the consent, the court stated that "considering her age, immaturity, lack of education, and mental situation that she found herself in" Donna "was not in a state of mind to be buying a car, and certainly not signing consents" for adoption of her child. The court concluded that even if Donna's assumptions about the adoption were "unreasonable" and "foolish," these factors fatally undermined the "strength" of Donna's consent.

The superior court stated that "the legislature is a little coy, and so is the supreme court in telling me exactly what sort of grounds I could ... rely upon to invalidate a consent," but that "[i]t generally seems to be

---

7. The decree itself made no mention of visitation. Because: (1) the Smiths' attorney prepared the findings and conclusions and the decree; (2) the court entered the findings and conclusions and the decree at the same time and appears to have treated the findings and conclusions as a part of the decree; and (3) the parties likewise have treated the findings and conclusions as a part of the decree, we follow the court's and the parties' convention. But we note for future application that the existence (but not the details) of post-adoption visitation rights must be set forth in the adoption decree. *See, e.g., Alden H. v. State, Office of Children's Servs.,* 108 P.3d 224, 229 n. 19 (Alaska 2005) ("a natural parent is entitled to request inclusion of visitation rights in a future decree."); *In re Adoption of Keith M.W.,* 79 P.3d 623, 630–32 (Alaska 2003) (holding deviation from ICWA placement preferences was justified because parent consented to open adoption by non-native couple and remanding case to trial

court "for a determination of the nature and schedule of contact and visitation as provided in the adoption decree"). Doing so will avoid later disputes over whether visitation was to be allowed despite the decree's silence on the matter. *See* HARALAMBIE, *supra* note 1, § 14.21 ("Where both the natural and adoptive parents agree, and where state law permits private adoption, the parties may draft an open adoption agreement. If the court is unwilling to incorporate the terms into the adoption decree, the parties may nonetheless maintain their agreement in the form of a collateral writing. It is doubtful, however, that such an agreement would be enforceable in the event that the adoptive parents refused to allow continued contact.").

8. *See* AS 25.23.140(b) (adoption decree generally may not be questioned by any person for any reason after one year).

done in the same fashion as an analysis of a contract ... because we've talked about misrepresentations, and fraud and duress, and I guess a mistake." The court then applied a contract analysis and found that there had not been a "meeting of the minds" with respect to the post-decree relationship among the Smiths, Donna, and the child:

> [Donna] and her parents were on different tracks entirely. They really intended to become this child's parents and I really think that [Donna had] some vague concept whereby they were going to be the grandparents who raised her kid for a while at least, and maybe for the full 18 years.

The superior court stated that it needed to "reopen this and have a look and see what [was] in the best interest of this child." The court applied the best interests analysis set forth in AS 25.24.150(c),[9] generally applicable in divorce-like proceedings,[10] to determine whether Donna or the Smiths should raise the child. In Donna's favor, the court found that: (1) there was a natural bond between Donna and her child; Donna had matured in the year since giving up the child for adoption; Donna was the one more willing to allow the other to play a role in the child's life; and Donna was the more age-appropriate parent. In the Smiths' favor, the court found that because the couple had custody of the child for more than a year, they had bonded with her and she with them, and that they clearly were more experienced as parents. The court ultimately concluded that it was in the child's best interests to be raised by Donna.

A written order setting aside the adoption was issued shortly after the hearing; the child was removed from the Smiths' custody and given to Donna that day. The Smiths moved for reconsideration, a stay pending reconsideration, and if necessary, a stay pending appeal. The motion was denied. In its order denying reconsideration the superior court clarified the basis for its earlier ruling: "the court has the power to vacate the adoption decree upon the ground of mistake, [Donna] met her burden of proof showing mistake, and ... setting aside the adoption is in the best interests of the child."

The Smiths appealed. Pending resolution of the appeal we ordered that in lieu of a stay of the superior court's order, the superior court establish a visitation schedule for the Smiths and the child.

## III. STANDARD OF REVIEW

 Although we review the superior court's factual findings in adoption proceedings for clear error,[11] we review de novo as

---

9. AS 25.24.150(c) provides:

 (c) The court shall determine custody in accordance with the best interests of the child under AS 25.20.060–25.20.130. In determining the best interests of the child the court shall consider
 (1) the physical, emotional, mental, religious, and social needs of the child;
 (2) the capability and desire of each parent to meet these needs;
 (3) the child's preference if the child is of sufficient age and capacity to form a preference;
 (4) the love and affection existing between the child and each parent;
 (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
 (6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child;
 (7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;
 (8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;
 (9) other factors that the court considers pertinent.

10. *See* AS 25.24.150(a).

11. *See In re Adoption of Missy M.*, 133 P.3d 645, 648 (Alaska 2006) (we reverse controlling factual findings if clearly erroneous) (citing *In re Adoption of Bernard A.*, 77 P.3d 4, 7 (Alaska 2003)). A factual finding is clearly erroneous "when a review of the record leaves us with the definite impression that a mistake has been made." *Id.* (citing *Fardig v. Fardig*, 56 P.3d 9, 11 (Alaska 2002)).

matters of law whether (1) factual findings satisfy the requirements for application of a statute,[12] or (2) an adoption decree is void for lack of consent,[13] adopting "the rule of law that is most persuasive in light of precedent, reason, and policy." [14]

As we recently stated:

> When reviewing factual findings we ordinarily will not overturn a trial court's finding based on conflicting evidence, and we will not re-weigh evidence when the record provides clear support for the trial court's ruling; it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence.[15]

## IV. DISCUSSION

### A. Donna's Consent and the Adoption Decree Should Not Have Been Set Aside Based on "Mistake" About Post–Adoption Relationships or the Best Interests of the Child.

The superior court may set aside an adoption decree if it is challenged within the first year.[16] But there is a presumption favoring the validity and regularity of an adoption decree,[17] and the burden is on the challenging party to show by a preponderance of the evidence that the decree is invalid.[18] Ambiguities in an adoption decree are to be construed in favor of validity of the decree.[19] In this case the validity of the adoption decree turns on the validity of Donna's consent, because withdrawal of her consent was prohibited once the decree was entered.[20]

We first note that an adoption decree should not be set aside lightly. The clear policy of the adoption statutes is to hold a biological parent to the terms of a signed consent and to the adoption decree, except under limited circumstances. This is evidenced by the fact that after a year has elapsed from the entry of a decree, it cannot be challenged for any reason, even one as egregious as fraud or misrepresentation: [21]

> Adoptive custody results in the rapid development of lasting and powerful psychological ties between adoptive parents and children, especially young children. Once formed, these bonds can seldom be severed without irreparable damage to the child's well-being.... As we said in *In re T.N.F.*, 781 P.2d 973, 980 (1989), *cert. denied sub nom. Jasso v. Finney*, 494 U.S. 1030, 110 S.Ct. 1480, 108 L.Ed.2d 616 (1990):

> > To allow collateral attacks on final adoption decrees at any time threatens to unreasonably disrupt the upbringing of the adopted child. AS 25.23.140 is a strong policy statement by the Alaska Legislature that an adoption decree should not be challenged on any ground after one year.[22]

---

**12.** *Missy M.*, 133 P.3d at 648 (reviewing application of facts to adoption statute).

**13.** *C.T. v. J.S.*, 951 P.2d 1199, 1199–1200 (Alaska 1998) (reviewing whether adoption was void for lack of consent); *see also In re Keith M.W.*, 79 P.3d at 624–25 (stating that "[t]he legal validity of a parental relinquishment or termination order is a question of law" to which a de novo standard of review applies and that relinquishment of parental rights could "function as consent" to adoption).

**14.** *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

**15.** *Tessa M. v. State, Dep't of Health & Soc. Servs.*, 182 P.3d 1110, 1114 (Alaska 2008) (internal citations omitted).

**16.** Alaska Adoption R. 17(a) ("A person may move to set aside the decree by filing a motion stating the grounds for challenging the validity of the decree...."); AS 25.23.140(b) (decree may not be questioned on any ground after expiration of one year).

**17.** *Holt v. Powell*, 420 P.2d 468, 470 (Alaska 1966) (existence of decree "raises a presumption of its validity and regularity" and implies court found facts necessary for jurisdiction).

**18.** Alaska Adoption R. 17(a) ("[T]he burden is on the party challenging the decree to show by a preponderance of the evidence that the decree is not valid.").

**19.** *Holt*, 420 P.2d at 470.

**20.** AS 25.23.070(a) ("A consent to adoption may not be withdrawn after the entry of a decree of adoption.").

**21.** AS 25.23.140(b).

**22.** *Hernandez v. Lambert*, 951 P.2d 436, 441–42 (Alaska 1998).

In response to Donna's collateral attack on the adoption decree in this case, the superior court found "mistake" in the adoption process, specifically the lack of a "meeting of the minds" about the post-decree relationship among Donna, the Smiths, and the child. The court thought Donna "maybe foolishly misunderstood what was happening," and "she may have unreasonably assumed that ... she would come and go as mom, with grandparents raising the children"; while the Smiths felt the need to "maintain [the] fiction" that "they're the parents and [Donna's] not the parent anymore."[23] After implying that this "mistake" invalidated Donna's consent, the court went on to apply a best interests analysis to determine whether the adoption decree should be set aside. The court concluded that "the best interest of the child would be served by returning [her to Donna]."

The Smiths argue that invalidation of an adoption decree is limited to the grounds mentioned in AS 25.23.140(b), namely fraud, misrepresentation, failure to give required notice, and lack of jurisdiction. None of these grounds was found by the superior court. But that provision states only that "upon the expiration of one year after an adoption decree is issued, the decree may not be questioned ... in any manner upon any ground, *including* fraud, misrepresentation, failure to give any required notice, or lack of [personal or subject matter] jurisdiction."[24] This does not necessarily preclude other grounds for a challenge brought before the one-year period expires.[25] That interpretation would be inconsistent with our view that adoption consent provisions should be construed to protect the rights of biological parents.[26]

**23.** That an adoptive parent is in fact the child's parent to the exclusion of the biological parent is hardly a "fiction" under the law. We already have acknowledged that the mere execution of a consent to adoption "ordinarily delegates to the adoptive parents all powers permitted under AS 13.26.020 [governing powers of attorney], including the 'powers regarding care, custody, or property of the minor child or ward.'" *In re Keith M.W.*, 79 P.3d at 629 (citing AS 25.23.060(c)). When an adoption decree is final the former parent's legal relationship with the child is terminated, rendering the former parent a non-parent—AS 25.23.130(a)(1)-(2) provides that the effect of an adoption decree is to "relieve the natural parents of the adopted person of all parental rights and responsibilities"; to "terminate all legal relationships between the adopted person and the natural parents"; and "to create the relationship of parent and child between petitioner and the adopted person, as if the adopted person were a legitimate blood descendant of the petitioner, for all purposes." Prior to the legislative enactment of AS 25.23.130(c) to allow biological-relative visitation rights with a child given up for adoption, we stated that AS 25.23.130(a) "clearly provides, however harshly, that the final decree has the effect of making an adopted child a 'stranger' to the former relatives." *Matter of W.E.G.*, 710 P.2d 410, 414 (Alaska 1985) (declining to find blood-relative visitation rights with adopted child). Although AS 25.23.130 now does not preclude an ongoing relationship between a biological parent and a child given up for adoption, it still clearly envisions that the adoptive parents in fact become the child's parents.

**24.** AS 25.23.140(b) (emphasis added).

**25.** For example Wyoming expressly includes duress as a ground for invalidating an otherwise irrevocable consent to an adoption. Wyo. Stat. Ann. § 1–22–109(d). Some jurisdictions recognize "force of circumstances" or "undue influence" as grounds for invalidating consent to an adoption, but others do not. *Compare Morrow v. Family & Cmty. Serv. of Catholic Charities, Inc.*, 28 Ohio St.3d 247, 504 N.E.2d 2, 5 (1986) (describing standard for determining validity of consent and "how that consent may have been affected by duress or undue influence"), *with In re T.R.*, 777 P.2d 1106, 1110–11 (Wyo.1989) ("[S]ome courts have expanded the meaning of duress to include 'force of circumstances' and 'undue influence.' ... We are not inclined, nevertheless, to expand the grounds upon which a revocation of consent to adoption may be premised.").

**26.** *See In re Adoption of A.F.M.*, 960 P.2d 602, 604–05 (Alaska 1998) (when AS 25.23.050 is susceptible to two interpretations, the interpretation most favorable to biological parent is selected); *In re Adoption of K.M.M.*, 611 P.2d 84, 87 (Alaska 1980) (strictly construing former AS 20.15.050, now AS 25.23.050, in favor of biological parents when determining whether adoption consent is required); *but see S.O. v. W.S.*, 643 P.2d 997, 1002 n. 7 (Alaska 1982) (construing former AS 20.15.060(b), now AS 25.23.060(b); stating that because the paramount purpose of adoption laws is to provide for children's welfare, adoption statutes should be construed to promote this purpose rather than to protect rights of biological parents; and holding that substantial compliance with technical consent requirements is sufficient when statutory purpose has been fulfilled), *overruled on other grounds by Rosen v. Bd. of Pub.*

■ But we note that confusion, mistake about the finality of the agreement, and a "change of heart" are generally insufficient grounds to invalidate consent to an adoption.[27] We also note that the most recent version of the Uniform Adoption Act provides that the validity of an adoption decree may not be challenged for failure to comply with an open adoption agreement.[28]

The legislature took specific action to allow open adoptions in Alaska by enacting AS 25.23.130(c) after a decision by this court that Alaska's adoption statutes did not allow open adoption agreements.[29] That provision states that nothing in the adoption statutes "prohibits an adoption that allows visitation between the adopted person and that person's natural parents or other relatives."[30] We subsequently noted that although this statute does not give biological parents an inherent right to post-adoption visitation, it does authorize courts to fashion open adoption decrees securing visitation rights to a biological parent if it is in the child's best interests to do so, *with or without an agreement* between the biological and adopting parents.[31]

The superior court found that there was not much "strength" in Donna's consent because of her lack of maturity and that her "foolish" misunderstanding about her post-adoption relationship with the child was a "mistake." But even if Donna was laboring under a "mistake" (and not simply having a "change of heart"), this mistake is insufficient to invalidate Donna's consent.

■ First, if the adoption decree's underlying conclusion that Donna "shall retain visitation rights" is ambiguous because of a lack of detail, ambiguities are construed in favor of validity of the adoption decree.[32] Second, the contours of an open adoption are subject to the best interests of the child, regardless of the detail and content of an agreement by the parties.[33] We therefore agree with the current Uniform Adoption Act that post-decree disputes about details of an open adoption cannot be grounds to set aside an adoption decree. If the parties cannot resolve post-decree disputes about the boundaries of a biological parent's relationship with an adopted child, these boundaries can be determined by the court.

■ The Smiths also argue that it was error to apply a best interests analysis to set aside the adoption decree. We agree. While it is true that adoption statutes generally are "to be liberally construed to the end that the best interests of adopted children are promoted,"[34] those statutes also are to be construed with "due regard" for the "rights of all persons affected" by the adoption.[35] Nowhere do the adoption statutes suggest that a valid adoption decree can be set aside on the ground that it is in the child's best interests to do so.[36] It is unfortunate but true

*Accountancy,* 689 P.2d 478, 481–83 (Alaska 1984).

**27.** *See In re Adoption of Infant Girl Banda,* 53 Ohio App.3d 104, 559 N.E.2d 1373, 1384 nn. 10–11 (1990) (listing cases from various jurisdictions); *In re Adoption of Jimenez,* 136 Ohio App.3d 223, 736 N.E.2d 477, 479 (1999).

**28.** Unif. Adoption Act § 3–707(c) (1994) (validity of adoption decree may not be challenged for failure to comply with agreement for visitation or communication with an adoptee). Alaska has adopted a modified version of the 1969 Uniform Adoption Act. *In re J.J.J.,* 718 P.2d 948, 952 (Alaska 1986); *K.M.M.,* 611 P.2d at 87; Unif. Adoption Act § 8 (1969). *See also Matter of J.L.F.,* 912 P.2d 1255, 1264 n. 10 (Alaska 1996) (noting that the 1969 Act was superseded by the 1994 Uniform Adoption Act). In *In re Adoption of Keith M.W.,* we looked to the 1994 Act and its commentary for guidance on an adoption issue. 79 P.3d at 628 & nn. 39–42.

**29.** *In re Adoption of A.F.M.,* 960 P.2d at 605 n. 4.

**30.** AS 25.23.130(c).

**31.** *In re Adoption of A.F.M.,* 960 P.2d at 605–06.

**32.** *Holt,* 420 P.2d at 470.

**33.** *See In re Adoption of A.F.M.,* 960 P.2d at 606.

**34.** AS 25.23.005.

**35.** *Id.; see also In re K.L.J.,* 813 P.2d 276, 278–80 (Alaska 1991) (accommodating best interest of child to be adopted with due process guarantee of court-appointed counsel to contest adoption).

**36.** A best interests analysis is explicitly warranted only when a parent wishes to withdraw consent to an adoption after the ten-day grace period has expired but before an adoption decree is entered. *See* AS 25.23.070(b). This was the

that the best interests of a child alone do not always control placement determinations. There are times when it may be in the best interests of a child to be adopted, but in the absence of parental consent that may be impossible.[37] Just as the best interests of a child cannot alone overcome a lack of consent, the best interests of a child cannot alone overcome a valid consent and previously entered adoption decree.[38]

**B. Donna's Consent and the Adoption Decree Cannot Be Set Aside on an Alternative Ground of Fraud, Misrepresentation, Duress, or Undue Influence.**

■ Donna argues that her consent should have been invalidated because of: (1) actual or constructive fraud or misrepresentation;[39] (2) duress;[40] or (3) undue influence;[41] and she asks that we affirm the superior court on one of these alternative grounds.[42] The court specifically found that

---

setting in *S.O. v. W.S.*, the case relied upon by the superior court to justify looking at the child's best interests here. 643 P.2d at 1000–01, 1004–06. Here, the window for withdrawing consent already had closed: six months had elapsed after the entry of the decree before Donna filed her petition to set aside the adoption.

**37.** *See* AS 25.23.050(a) (setting out limited factual predicates for adoption without consent); *D.L.J. v. W.D.R.*, 635 P.2d 834, 838 (Alaska 1981) (best interests of the child are not relevant to separate determination of whether natural parent's consent is required); *In re Adoption of L.A.H.*, 597 P.2d 513, 517 n. 14 (Alaska 1979) (former AS 20.15.120(c), now AS 25.23.120(c), disposes of the argument that father's consent not necessary if adoption is in best interests of child).

**38.** *See, e.g., In re Navajo County Juvenile Action No. JA–691*, 171 Ariz. 369, 831 P.2d 368, 375 (App.1991) ("[T]he best interests of the children are simply irrelevant because, under [the statute], an adoption is irrevocable unless obtained by fraud, duress or undue influence.").

**39.** We recently discussed the difference between tortious fraud and the level of misrepresentation necessary to avoid a contract in *Seybert v. Cominco Alaska Exploration*, 182 P.3d 1079 (Alaska 2008). To sue in tort for damages related to misrepresentation, a party must establish a false statement of fact, scienter, intent to induce reliance, actual reliance, and damage. *Id.* at 1094 n. 48. To avoid an obligation, however, a party need show only material misrepresentation and justifiable reliance. *Id.* at 1094.

In *Adams v. Adams*, 89 P.3d 743 (Alaska 2004), we described constructive fraud as follows:
Constructive fraud exists in cases in which conduct, although not actually fraudulent, ought to be so treated,—that is, in which such conduct is a constructive ... fraud, having all the actual consequences and all the legal effects of actual fraud. Stated otherwise, constructive fraud is a breach of a duty, which while not intentionally deceptive or actually dishonest, the law declares fraudulent because of its tendency to deceive others.

*Id.* at 750 (internal citations omitted).

**40.** "Duress generally requires a threat that arouses such fear as to preclude a party from exercising free will and judgment, or 'it must be such as would induce assent on the part of a brave person or a person of ordinary firmness.'" *Crane v. Crane*, 986 P.2d 881, 887 (Alaska 1999) (citing 25 Am.Jur.2d *Duress and Undue Influence* § 1 (1996)).

**41.** Undue influence is the exercise of sufficient control over a person that: (1) deprives that person of freedom of choice or overcomes that person's free will and substitutes the will of another in its place: (2) "precludes [that person's] exercise of free and deliberate judgment"; or (3) "coerces [that] person into doing something" that would not have been done absent the influence. 25 Am.Jur.2d *Duress and Undue Influence* § 36 (2004). The basic elements of undue influence are: (1) "a susceptible party"; (2) the opportunity for another "to exert influence"; (3) the exertion of improper influence; and (4) a result showing the effect of the improper influence. *Id.* The existence of undue influence depends upon the particular facts of a case, and "the focus must be on whether the influence is reasonable under the circumstances." *Id.* at § 37 (internal citations omitted).

We have addressed the test for undue influence in the context of making wills:
The party challenging a will must prove that the "testator was virtually compelled to make a will [that the testator] would not have made [if] left to the free exercise of [the testator's] own judgment and wishes." We approach this issue by asking whether a person used "coercion and duress which would act as a dominating power over the mind and act of a testator." In other words, was the willpower of the testator "so destroyed as to substitute the will of another?"

*Crittell v. Bingo*, 36 P.3d 634, 639 (Alaska 2001) (internal citations omitted). We more recently relied on *Crittell* to establish the same test for *inter vivos* gifts. *Ware v. Ware*, 161 P.3d 1188, 1193–95 (Alaska 2007).

**42.** *See Atcherian v. State, Dep't of Revenue, Child Support Enforcement Div.*, 14 P.3d 970, 974 n. 8

there had been no fraud or misrepresentation by the Smiths and may also have found there was no duress: "[W]e've talked about misrepresentations, and fraud and duress, and I guess a mistake ... I don't find any fraud here, I don't find any misrepresentation. I don't think there was a meeting of the minds though with respect to what was going to happen." The court made no specific mention of undue influence, but, as with duress, may have implicitly found no undue influence given its ruling.

█ The superior court's actual findings of fact can be set aside only if clearly erroneous, *i.e.*, only if after a review of the record we are left with the firm and definite conviction that the court made a mistake.[43] When we are asked to consider factual determinations not made by the superior court, we are limited to reviewing the record to see if the factual issues were nonetheless established as a matter of law.[44] We therefore must examine the testimony presented at the evidentiary hearing, as follows.

Donna lived with her mother in Iowa for the first four or five months of her pregnancy and then moved to Alaska to live with the Smiths. Donna testified that "not at any time" did she want to give up her child for adoption. But there was other testimony that before the child was born, Donna told Mr. and Mrs. Smith, her physician, her pre-natal home visitor, two of her stepsisters, one of Mr. Smith's co-workers, and the child's biological father that she wanted to give up the child for adoption. She told some of them that she was not ready to be a mother and others that she was going to move to California.

Donna testified that she had no recollection of discussing adoption with the Smiths prior to the child's birth. When directed to her previous deposition testimony that she had conversations with the Smiths about adoption prior to the child's birth, Donna agreed this refreshed her recollection that there had been some discussions. Mr. Smith testified that prior to the child's birth Donna discussed options of abortion, adoption, and keeping the child. Donna's stepsister testified that she first offered to adopt the child, but because she was expecting her first child at about the same time, later declined to do so. Mrs. Smith testified that a week or so before the child was born, Donna asked her if the Smiths would adopt the child. Mr. Smith then began looking into the adoption process. Mrs. Smith testified that while still in the hospital and in her presence, Donna told a doctor that she was going to give up the child for adoption by the Smiths and move to California.

Donna and the child lived with the Smiths for about a week after coming home from the hospital. Mr. Smith testified that despite Donna's early talk about giving up the child for adoption, he expected her to change her mind, and he "was anxious to—see her make a go of it." According to Mrs. Smith Donna changed her mind about adoption within two or three days after the child was born.

Donna and the child moved in with Donna's stepsister and her stepsister's boyfriend "to get out on [her] own," but, according to both Donna's stepsister and the child's biological father, Donna concluded that she was unable to deal with the responsibilities of raising the child. Donna testified: "I was very stressed out. I was doing it all alone and I had no help from nobody. I was very stressed out. I wasn't eating and I wasn't sleeping at all." Donna's stepsister's boyfriend testified that Donna asked them to adopt the child, but he believed it would be too much for them along with their own

(Alaska 2000) ("We may affirm a superior court's decision on any legal ground that appears in the record, even if the superior court did not consider the alternative ground." (citing, among other cases, *N. Lights Motel, Inc. v. Sweaney*, 563 P.2d 256, 257 (Alaska 1977))).

43. *See supra* note 10.

44. *See In re Estate of Brandon*, 902 P.2d 1299, 1318–19 (Alaska 1995) (superior court directed to consider previously unconsidered claim of duress on remand because "[g]iven the record, we cannot say as a matter of law that the claim of duress is without merit"); *cf. A & G Constr. Co., Inc. v. Reid Bros. Logging Co., Inc.*, 547 P.2d 1207, 1219 (Alaska 1976) (where trial court did not make findings and conclusions on issue of economic duress, this court "[is] unable to determine whether the [trial] court considered this issue [and] it is necessary to remand the case for further findings and conclusions").

newborn. Donna's stepsister testified that she suggested Donna go back and talk to the Smiths about an adoption, and that she let Donna know it would be "a final thing; it wasn't something that they were just going to babysit [the child] for a few months, and then [the child] was going to come back [to Donna]."

According to Mrs. Smith, Donna called on November 8 or 9, 2006, to again request that the Smiths adopt the child, telling Mrs. Smith that raising the child was too much for her, that there were other things she wanted to do with her life, and that she was not ready to be a mother. Mrs. Smith testified that the Smiths talked with Donna about other possible candidates to adopt the child, but Donna wanted the Smiths to adopt the child because she did not want the child to be adopted outside the family or to lose contact with the child. Donna testified only that she recalled having a conversation with her stepsister about her situation and that on November 8 or 9 Mrs. Smith called her and they "talked about . . . having her take the baby."

Donna testified that she gave the child to the Smiths on November 9, 2006, but she understood the Smiths "were going to take her to help me and then I could—when I was ready that they were going to give her back." Mrs. Smith testified that the Smiths took the child only after Donna agreed to a formal adoption. Mr. Smith testified that it was clear from the very first discussions about adoption that they would only take the child if there was a legal adoption. The Smiths denied ever suggesting that if they adopted the child, Donna could have the child back when she was ready.

Mr. Smith testified that it was a difficult decision to agree to adopt Donna's child:

I mean, if—like I say, I was pushing 50 and personal daycare was the last thing I was thinking about when I was 49 years old, but it's family, and it's what we—she asked us to do, it's what we volunteered to her to do because that's what families do for family. You know, we weren't going to have it nor did [Donna] want it to go to strangers and disappear out of our lives.

Mr. Smith also testified about his discussions with Donna about post-adoption relationships and the open adoption:

Q. [W]hat, if any discussions do you recall where you told [Donna] the baby would be there for her when she wanted to come to become a mom? In other words, she could ask for it and get it back?

A. Well, that never happened. I mean, that's why we were going through the adoption. An adoption is for real, it's not babysitting, it's not just for a while, it's not healthy for the child, you know, we're not going to bounce [her] back and forth. And she needed the stability of the family and if we were going to do this, that [we] were going to adopt her, you will always be a part of the family, [Donna], you're my daughter, you know, this will give you a chance to—to develop a relationship with [her] like a big sister, you'll be, you know, able to have fun and—and this kind of approach versus the disciplinary, everything that you don't want about it, [she] will still be there and some day in the future, that's why mom's keeping two baby books, you know, the truth will come out, just like the truth with all of our kids, my step-kids, my wife's step-kids, everybody knows who their biological parents are. And there's no reason that [this] would be any different, but we weren't going to keep her for a couple of weeks or a couple of months. . . . That's [what] we committed to do and that's what we're doing, and it was understood with all parties that, yes, you're going to raise [her], you're going to adopt [her], and it was easy for [Donna] to do because [Donna] knows the kind of home that [she] was coming into and going to be raised in.

Donna testified that she went with the Smiths to their attorney's office to sign some papers on November 13 but did not know what she was signing—she "thought it was help so they could take [the child] to the doctor and if something happened . . . make sure she was okay." She testified that her "mental state really wasn't there, I mean, I was restless, . . . I was very upset." She testified that she had no recollection of anything the attorney told her. Donna testified

that she thought that if she did not go with the Smiths to the attorney's office they would not help her, although she had no idea what would have happened if she had not signed the paperwork.

According to the Smiths' attorney: (1) he read and discussed the consent form with Donna; (2) he believed Donna understood the terms of the adoption and of the consent, as did the Smiths; (3) he gave Donna the chance to reflect on her consent before she signed it. Mrs. Smith and the attorney testified that Donna was not restless and upset, but rather was normal, pleasant, and even eager and happy to sign the consent. Donna admitted she was not forced to sign anything.

The attorney testified that during the meeting he noted that the adoption required the consent of the biological father, and that Donna provided the name and contact information. Mrs. Smith testified that Donna "was very willing to call him and get all the needed information." Donna testified that she contacted the biological father and that she understood he was permanently giving up his parental rights by signing the paperwork; she did not know exactly what he signed, but guessed he signed the same thing she did. Donna claimed she "never once, to [her] best recollection, used the word adoption," but "just told him he was giving his right, you know, I told him that [the Smiths] were taking [the child] in."

The biological father testified that Donna told him: (1) she was not able to handle the responsibility of parenting the child; (2) the best thing to do was to give up the child for adoption; and (3) the Smiths had offered to adopt the child. He testified that he thought it was in the child's best interests to be adopted by the Smiths and that he relinquished his parental rights so the Smiths could adopt the child.

Donna continued to live with her stepsister and her stepsister's boyfriend for two or three months after the child went to live with the Smiths. Donna's stepsister testified that Donna told her about going to the attorney's office and signing the adoption consent papers. Donna did not complain about signing the consent and never indicated that she wanted to undo the adoption or get the child

back. According to Mrs. Smith, after Donna signed her consent but before the adoption decree was entered, Donna called Mrs. Smith to talk about feeling uncomfortable when people asked about the child and said she was telling people that the Smiths were babysitting. Mrs. Smith encouraged her to be honest and accept the situation. At no time prior to the adoption decree did Donna tell the Smiths that she did not want to go through with the adoption.

Donna's prenatal home care visitor testified that Donna said she intended to give up the child for adoption and move to California; Donna denied recollection of the conversation. Donna admitted that she had plans to go to California to visit her mother and admitted that her mother told her not to come, but denied that it had anything to do with adoption. But Donna acknowledged previous deposition testimony that when she told her mother she would not be bringing the child because she was giving it up for adoption, her mother told her not to come without the child.

Donna also testified that until March 2007, she did not actually realize the child had been adopted by the Smiths. But Donna's prenatal home care visitor testified that she was concerned about Donna being depressed, and that she provided Donna with a handout about grief over the loss of a child through death or adoption within one month of Donna giving the child to the Smiths. Donna's stepsister testified that Donna told her she had gone to a lawyer's office and signed papers consenting to the adoption within a week of it happening.

The foregoing testimony provides substantial evidence to support the superior court's explicit finding that the Smiths had not engaged in fraud or misrepresentation, and that finding is not clearly erroneous. We glean from this finding and other comments by the superior court, including its emphasis that the Smiths' attorney did an excellent job explaining the adoption consent to Donna, that the court did not believe Donna had no idea she was giving up her child for adoption when she signed paperwork in the attorney's office. Even if, as the

superior court suggested while giving Donna some benefit of the doubt, Donna "was probably foolish" and "may have unreasonably assumed ... she could come and go as mom," on this record we cannot overturn the superior court's finding that her foolish and unreasonable assumption was not the result of any material misstatement of fact or similar wrongful conduct by the Smiths.

■ Donna's claims of duress and undue influence also must fail on this record. A fair reading of the superior court's oral decision reflects that the court implicitly found no duress or undue influence by the Smiths, and these findings are supported by substantial evidence and are not clearly erroneous. There is no evidence in the record to suggest that the Smiths somehow threatened and aroused such fear in Donna that she could no longer exercise her free will to refuse her consent to the adoption. Similarly there is no evidence in the record to suggest that the Smiths assumed control of Donna's free will, precluded Donna from exercising her own free and deliberate judgment about her options and about consenting to the Smiths' adoption of the child, or coerced her into an adoption to which she otherwise would have not have agreed. Even if the superior court did not implicitly address undue influence or duress, as a matter of law this record cannot support such claims.

Testimony showed that Donna considered and made up her own mind about adoption prior to the child's birth, then changed her own mind and decided to keep the child, and then changed her own mind again after unsuccessfully trying to live on her own and be a mother to the child. The evidence in the record reflects that: (1) the Smiths supported Donna's decisions, but did not make them for her; (2) Donna asked the Smiths to adopt the child after discussing other placement options; (3) Donna specifically wanted the Smiths to adopt the child to keep the child within the family; (4) Donna personally contacted the child's biological father and persuaded him to relinquish his parental rights, telling him it was in the best interests

of the child to have the Smiths adopt her; and (5) the Smiths were reluctant to adopt the child because of their age, but agreed to do so to help Donna, their daughter.

We accept Donna's arguments that: (1) she was in a difficult situation; (2) she was young, inexperienced, and immature; (3) she was "stressed-out" trying to be a mother to her child; and (4) she needed help. We also accept Donna's argument that the Smiths were in a position to influence Donna's decisions. But these arguments overlook a critical component for Donna's claims of duress and undue influence—Donna must show that the Smiths did something wrongful. The Smiths certainly did nothing to put Donna in her difficult situation; the evidence actually reflects that the Smiths tried as best they could to help her in her time of need. Donna did not present any evidence that the Smiths threatened her or tried to force her to give up her child for adoption. Nor has Donna suggested a motive for the Smiths to do anything wrongful—the only evidence in the record about motive is Mr. Smith's testimony that the Smiths agreed to adopt the child because it was what Donna wanted, because it would avoid Donna and the family losing the child completely, and because it was "what families do for family."

We therefore reject Donna's argument that the superior court's decision can be affirmed on alternative grounds of actual or constructive fraud or misrepresentation, duress, or undue influence.

## C. We Reverse the Order Invalidating the Adoption Decree and Remand for Consideration of a Visitation Framework in the Best Interests of the Child.

The decision to invalidate the adoption decree cannot be sustained. The adoption decree must be reinstated, and the child must be returned to the Smiths. If Donna and the Smiths cannot agree on post-adoption visitation, the superior court must consider an appropriate visitation framework for Donna.[45]

45. We recognize that the superior court considered and rejected this path, stating that "forc[ing] that down the throat of both parties, I

don't think that's the way to resolve this case." But in the absence of a legitimate basis to invalidate Donna's consent to the adoption, consider-

We note that the child's living situation will tend to foster the kind of open adoption that must have been contemplated: (1) the parties live in a small community; (2) the child will be raised by her biological grandparents; (3) Donna has seven siblings who will be the child's biological aunts and uncles as well as adoptive brothers and sisters; and (4) Donna will be the child's adoptive sister as well as biological mother. Under these circumstances it is very likely the child will become aware of her natural place in her extended family at an early age. The Smiths expected this and were planning for it by keeping two baby books, one reflecting the child's biological parents and their families. If the parties leave it to the court to fashion a visitation framework, these circumstances will no doubt play a significant role in its determination.

We also note that in fashioning a visitation framework the superior court must be mindful of addressing three potentially competing interests: (1) Donna is entitled to reasonable visitation with the child; (2) the Smiths are the child's legal parents and Donna's visitation may not unreasonably interfere with the Smiths' parental rights; and (3) the visitation framework must reasonably reflect the best interests of the child in light of the adoption and all other relevant family circumstances. Because the superior court did not attempt to fashion a visitation framework and the parties therefore have not discussed visitation in their briefing to us, we do not address legal issues that may be implicated in recognizing and accommodating these interests. If the superior court must fashion a visitation framework over the objection of an interested party, the court's decision should be supported by appropriate findings of fact and conclusions of law to allow appellate review.

## V. CONCLUSION

We REVERSE the court's order setting aside the adoption decree and REMAND with directions to return the child to the Smiths' custody and to consider a visitation framework for Donna that takes into account

ation of a visitation framework is the appropriate

the Smiths' parental rights, Donna's right to visitation, and the best interests of the child.