*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| ANGELICA C., | ) | |
| | ) | Supreme Court No. S-18015 |
| Appellant, | ) | |
| | ) | Superior Court No. 1JU-13-00945 CI |
| v. | ) | |
| | ) | O P I N I O N |
| JONATHAN C., | ) | |
| | ) | No. 7625 – October 14, 2022 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Juneau, Daniel Schally, Judge.

Appearances: Angelica C., pro se, Petersburg, Appellant. Fred W. Triem, Petersburg, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

CARNEY, Justice.

## I.   INTRODUCTION

A woman filed a petition to terminate the parental rights of the father of her child because the child was conceived as a result of sexual abuse. After years of litigation, including a previous appeal, the superior court held a hearing on the petition and denied it. The woman appeals. We affirm the superior court's denial of her petition.

## II. FACTS AND PROCEEDINGS[1]

Jonathan C. and Angelica C. had a sexual relationship which led to the birth of their child when Jonathan was 19 and Angelica was 14 years old.[2]  In 2010 Jonathan was convicted of attempted sexual abuse of a minor.[3]  Their child, J.T., was born in March 2010.[4]

### A. Termination Proceedings

#### 1. The 2016 petition to terminate parental rights

Angelica, Jonathan, and their families have been involved in disputes regarding J.T.'s custody since 2013.[5]  At various times Angelica, her parents, Jonathan, and Jonathan's father have had either shared or sole custody of J.T.[6]  In 2016 Angelica filed a petition based on former AS 25.23.180(e) to terminate Jonathan's parental rights.[7]  That statute authorized termination of parental rights in cases where sexual abuse of a minor resulted in the conception of a child.[8]  The superior court concluded that the statute

---

[1]     For a more detailed factual and procedural background see *Angelica C. v. Jonathan C.*, 459 P.3d 1148 (Alaska 2020).

[2]     *Id.* at 1152.

[3]     *Id.*

[4]     *Id.*

[5]     *See id.* at 1152-55.

[6]     *Id.*

[7]     *Id.* at 1153.

[8]     *Id.*; *see* former AS 25.23.180(e) (1987), amended by ch. 24, § 12, SLA 2018.

only allowed termination in an adoption case[9] or a child in need of aid (CINA) case.[10] Because Angelica filed her petition in a custody case, the superior court concluded that her petition was not authorized by the statute and denied it.[11]  Angelica filed a petition to this court for review of the decision, which we granted.[12]

### 2. Our 2020 opinion

In 2020 we reversed the superior court's order denying Angelica's petition to terminate Jonathan's parental rights.[13]  Prior to our consideration of the superior court's order, the legislature amended AS 25.23.180.[14]  Although the new law had taken effect, we interpreted former AS 25.23.180 to allow a petition for termination of parental rights in "an 'independent proceeding' distinct from adoption and CINA proceedings."[15] We concluded that "the effect of the 2018 amendments was to clarify the statute" and remove any doubt that a petition to terminate parental rights could proceed in an "independent proceeding."[16]  And we disavowed dicta in previous cases which stated that adoption and CINA proceedings were the only "[t]wo means . . . for involuntarily

---

[9]    *See* AS 25.23.180(c) (providing for termination of parental rights in adoption proceeding).

[10]    *See* AS 47.10.080(c)(3) (authorizing termination of parental rights in CINA case); *Angelica C.*, 459 P.3d at 1153.

[11]    *Id.*

[12]    *Id.*

[13]    *Id.* at 1162.

[14]    *Id.* at 1155.

[15]    *Id.* at 1156.

[16]    *Id.* at 1158.

terminating parental rights in Alaska."[17]   Since Jonathan had "testified he had sexual intercourse with Angelica multiple times when she was 13 years old and he was at least 18 years old, and his admitted sexual abuse of Angelica is 'an act constituting sexual assault or sexual abuse of a minor,' " we held that "Jonathan is subject to having his parental rights terminated, but only if the superior court determines that it is in J.T.'s best interests to do so."[18]

We recognized that the stakes in a termination action under AS 25.23.180 "are higher than in an ordinary custody case" and the "irrevocable termination of parental rights is normally accompanied by heightened protections for the adverse parent."[19]   But we also acknowledged the legislature's choice to "protect the victims of sexual abuse from being subjected to years-long custody disputes with their assailants, re-victimizing them[,]" which "militate[d] in favor of weighing the underlying sexual abuse more heavily, and . . . that the victim-parent's rights should receive strong, though not necessarily dispositive, consideration."[20]   We directed that, on remand, the superior court must consider "the relevant best interests factors enumerated in the custody and adoption contexts, as well as other factors germane to the child's best interests, giving

---

[17]      *Id.* at 1156 (quoting *In re Adoption of Xavier K.*, 268 P.3d 274, 276 (Alaska 2012), *abrogated by Angelica C.*, 459 P.3d at 1156 ("Two means exist for involuntarily terminating parental rights in Alaska.  The first is the Children in Need of Aid (CINA) statute . . . .  The second is through adoption . . . ."); *see also Nelson v. Jones*, 944 P.2d 476, 479 (Alaska 1997), *abrogated by Angelica C.*, 459 P.3d at 1156 ("Alaska provides for the termination of parental rights only in the context of child in need of aid (CINA) proceedings under AS 47.10.080 and adoption proceedings under AS 25.23.180." (internal footnote omitted)).

[18]      *Angelica C.*, 459 P.3d at 1158 (quoting former AS 25.23.180(c)(3) (1987)).

[19]      *Id.* at 1159.

[20]      *Id.*

appropriate weight to the legislative policy choices" inherent in AS 25.23.180(c)(2).[21]

### 3. Termination proceedings on remand

On remand Angelica moved to proceed with the termination in the superior court. The superior court scheduled an evidentiary hearing in August 2020. By that time Jonathan had moved to Washington while Angelica and J.T. remained in Alaska.[22]

The guardian ad litem (GAL) who had been appointed to represent J.T.'s best interests filed a pre-hearing brief. She described the ten-year-old's situation, including his relationship with both sides of his family, and offered her opinion regarding J.T.'s best interests. The GAL wrote that J.T. "knows and loves his father, paternal [grandparents and] has relationships with a large extended family on his father's side" including a half-brother. The GAL reported that Jonathan had anticipated that J.T. would be able to join him in Washington, and, although that had not been possible, the two had long daily phone calls when J.T. stayed with Jonathan's father. The GAL also recognized J.T.'s close relationship with his maternal grandparents, observing that J.T. "spent more time with [them] than with any other members of his family."

But the GAL opined that "the maternal grandparents have made it their goal to terminate the rights of [J.T.'s] father, . . . have control of their grandson and eliminate" any connection between J.T. and Jonathan's family. The GAL noted Angelica's parents had "tremendous influence" over J.T., leading J.T. to repeat whatever they told him to say. The GAL referred to the "great lengths" Angelica and her parents had undertaken to disrupt J.T.'s relationship with Jonathan and his family, including repeated

---

[21]    *Id.* at 1160.

[22]    It appears that when she filed this appeal, Angelica had primary custody of J.T. pursuant to a 2014 custody agreement, but Jonathan (and his father) had visitation. *See id.* at 1152-55, 1162 (explaining the 2014 custody agreement and reversing a 2018 custody order).

unsubstantiated allegations that Jonathan and his family were involved in "drug abuse, physical abuse and sexual abuse." The GAL concluded that the "significance of [J.T.'s relationship with Jonathan] should not be underestimated" and that it was "not in [J.T.'s] best interests for his father's parental rights to be terminated." The GAL acknowledged the "huge" consequences of Jonathan's illegal relationship with Angelica, but ultimately concluded that J.T. "should not have to suffer the loss of his father and his father's family."

At the August hearing Angelica called her father as a witness. Her father testified that J.T. would continue to reside with Angelica, his wife, and him if Jonathan's parental rights were terminated. When asked how that would affect J.T.'s relationship with his other grandfather, Angelica's father responded that he thought that "fundamentally nothing will change," but he conceded that he would not support a custody agreement which granted Jonathan's parents any sort of visitation. He also testified that "the circumstances have to be based on what the mother feels."

Angelica testified next. She testified that termination of Jonathan's parental rights was "the only way for me to begin the healing process," and that she believed the healing would help her become a better mother. When asked to describe what sort of relationship J.T. would have with his paternal grandparents if Jonathan's paternal rights were terminated, Angelica stated it would be "whatever [J.T.] feels comfortable with." Angelica also testified that, although she had previously abused drugs,[23] she had completed a substance abuse treatment program the previous year, and that she had been sober since that time.

Jonathan testified after Angelica. He reported that he had not seen J.T. in person since he moved to Washington in February 2019. He testified that he spoke to

---

[23]     *See id.* at 1153.

J.T. daily when J.T. was at Jonathan's father's house. Jonathan testified that he had moved to Washington for a better job "to support [J.T.] and try to build a [better life]," and that he sent money to his father to help pay for J.T.'s needs. Jonathan also stated that it was important for J.T. to know all of his family, including Angelica and her parents, and that he wanted J.T. to spend time with him and his parents in order to understand his Mexican heritage.

J.T.'s attorney advised the court that she could not accurately represent J.T.'s position to the court, noting that "he's [ten], and I don't know that he completely understands the legal ramifications" of the hearing. She stated that J.T. had "most definitely received pressure from [Angelica's] side of the family" regarding the termination proceedings. When she had been able to speak with J.T., he had told her that he didn't "want to hurt people's feelings" which made his attorney "really concerned."

### 4. 2021 order denying termination

The superior court denied Anglica's petition to terminate Jonathan's parental rights in early 2021. The court acknowledged our opinion that the 2018 amendments to AS 25.23.180 simply clarified the previous version of the statute. After considering the best interests factors found in AS 47.10.088(b)[24] the court concluded that "the factors . . . applicable in [a] termination of parental rights action in the [CINA] context" were difficult to apply because "the factual background in the instant case [bore] little or no resemblance to a CINA case, where a child is removed from a parent's home" due to abuse or neglect. It nonetheless considered AS 47.10.088(b)'s "non-

---

[24] AS 47.10.088(b) allows a court considering termination in a CINA or adoption case to "consider any fact relating to the best interests of the child" including "the history of conduct . . . by the parent," "the likelihood that the harmful conduct will continue," "the harm caused to the child," and "the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs."

exhaustive list" of factors. The court found it difficult to assess "the likelihood of returning the child to the parent"[25] since Jonathan had left Alaska and had no immediate plan to return. The court concluded that "[i]n terms of the other relevant factors set forth at AS 47.10.088(b)" Jonathan had not engaged in any further criminal conduct, there was no evidence he would do so in the future, and his prior criminal conduct did not "directly negatively affect the child."[26]

The court then turned to the factors established in AS 25.24.150(c).[27] The court found that the current custody arrangement — in which J.T. was primarily in the custody of Angelica and her parents, but spent some time with Jonathan's parents and had telephone and video contact with Jonathan — seemed to meet J.T.'s "basic physical, emotional, mental, religious, and social needs." The court also found that Jonathan did not currently have a living situation which would allow him to adequately raise a child, and it expressed skepticism that Angelica could raise J.T. without her parents' support. The court acknowledged that J.T. was reaching an age where his preference could "play a role in a custody decision" but, given the "[s]ignificant concern about coaching and pressuring the child (by [Angelica and her parents])" any weight "assigned to such a preference may be severely limited." The court found that there was "no doubt . . . that [J.T.] loves each of his parents and that this love [was] fully reciprocated." The court

---

[25] *See* AS 47.10.088(b)(1) (allowing court to consider "the likelihood of returning the child to the parent within a reasonable time").

[26] *See* AS 47.10.088(b) (allowing court to consider parent's prior conduct, "the likelihood that the harmful conduct will continue," and "the harm caused to the child").

[27] AS 25.24.150(c) enumerates nine factors, such as the "physical, emotional, mental, religious, and social needs of the child," that the court must consider when awarding custody.

also found that J.T. had "experienced a fairly substantial degree of instability in his basic living situation for years due to the unwillingness (and perhaps even inability) of [Angelica and her parents] to acknowledge and accept that the child has, wants to have, and needs to have an ongoing relationship with his paternal relatives — particularly his paternal grandparents." The court found "no evidence" that Jonathan would not facilitate a relationship between J.T. and Angelica.

The court also considered Jonathan's sexual abuse of Angelica. The court found that although Jonathan had been convicted of sexually abusing Angelica, "[t]he cooperative nature of the relationship[,] . . . undercuts [Angelica's] professed need for [Jonathan's] parental rights to be terminated." The court acknowledged that, although it was "not entirely clear[,] it would be difficult to believe that the sexual abuse plays no role whatsoever in [Angelica's] battle with controlled substance addiction." The court recognized a "central purpose behind AS 25.23.180 [is] to eliminate ongoing litigation that forces victims of sexual offenses to . . . interact with their abusers." But it also observed that the years-long custody disputes surrounding J.T. had "been fueled largely by an unswerving desire on the part of [Angelica and her parents] to keep the child with them and entirely away from" Jonathan and his parents. Looking to the evidence from the hearing, the court found that the facts of the case "blunt a central goal of AS 25.23.180" because Jonathan no longer lived in Alaska, had "resigned himself" to having contact with J.T. only when J.T. was with his father, and there was no evidence that he had used his paternal relationship to continue to contact or interact with Angelica.

The court found that it was not in J.T.'s best interests to terminate Jonathan's parental rights and that J.T.'s best interests outweighed the policy concerns of protecting victims of sexual abuse. The court concluded:

> [Jonathan] works to maintain his long-distance relationship
> with his son, as detailed by the guardian ad litem in her trial

brief, although his efforts are hampered by [Angelica and her parents]. The child is said to be disappointed that his father does not try harder to play a larger role in the child's life. But this ten year old child knows and loves his father and it would be detrimental to the child to forever sever this relationship and bond. Termination could conceivably cause the child to question his own self-worth given that he was born of an illicit relationship, and thereby seriously undermine his self-esteem as he stands upon the threshold of his teenage years. The termination of [Jonathan]'s parental rights would also likely sever the very strong bond that the child has with his paternal grandparents. These factors weigh heavily against terminating [Jonathan]'s parental rights. This is true even given the legislature's expression of public policy in relation to leveling the playing field for victims of domestic violence and sexual abuse. While it is true that the termination of [Jonathan]'s rights would be in [Angelica]'s best interest, the court cannot conclude that it is in the child's best interests, and that is the standard that the court must and does employ.

Because it found that termination of Jonathan's parental rights would not be in J.T.'s best interests, the court denied Angelica's petition.

Angelica, now representing herself, appeals the denial of her petition.

## III. STANDARD OF REVIEW

We have not previously articulated a standard of review for a termination petition in an independent proceeding under AS 25.23.180(c)(2) or former AS 25.23.180(c)(3).[28] In *Angelica C.* we instructed the superior court to consider the

---

[28]     *See Angelica C.*, 459 P.3d at 1156 (disavowing prior case law stating termination could only be achieved in adoption and CINA proceedings); AS 25.23.180(c)(2) ("The relationship of parent and child may be terminated by a court order issued in connection with . . . an independent proceeding on the grounds that the parent committed an act constituting . . . sexual abuse of a minor . . . that resulted in
(continued...)

best interests factors applicable to civil custody cases as well as those applicable to CINA proceedings.[29] We also directed the superior court to "giv[e] appropriate weight" to the legislature's policy decision to protect parents who are victims of sexual abuse.[30]

When we review the superior court's best interests decision in a custody case, we reverse "only if the trial court abused its discretion or if the fact findings on which the determination is based are clearly erroneous."[31] Similarly, in a CINA appeal we review the superior court's factual findings, including whether termination of parental rights is in the children's best interests, for clear error.[32] Because we directed the superior court to make a best interest determination using the statutory factors for both custody and CINA contexts, we will reverse the superior court's decision only if its findings of fact are clearly erroneous or it abused its discretion.

"A factual finding is clearly erroneous when a review of the record leaves [us] with a definite and firm conviction that the superior court has made a mistake."[33] A "trial court's factual findings enjoy particular deference when they are based 'primarily on oral testimony, because the trial court, not this court, judges the credibility

---

[28]     (...continued)
conception of the child and that termination of the parental rights of the biological parent is in the best interests of the child.").

[29]     *Id.* at 1159-60.

[30]     *Id.*

[31]     *See Ott v. Runa*, 463 P.3d 180, 185 (Alaska 2020) (quoting *Bruce H. v. Jennifer L.*, 407 P.3d 432, 436 (Alaska 2017)).

[32]     *See Sherry R. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 332 P.3d 1268, 1273 (Alaska 2014).

[33]     *Geldermann v. Geldermann*, 428 P.3d 477, 481 (Alaska 2018) (quoting *Riggs v. Coonradt*, 335 P.3d 1103, 1106 (Alaska 2014)).

of witnesses and weighs conflicting evidence.' "[34]  "Abuse of discretion is established if the trial court considered improper factors in making its custody determination, failed to consider statutorily mandated factors, or assigned disproportionate weight to particular factors while ignoring others."[35]  "Additionally, an abuse of discretion exists if the superior court's decision denied a substantial right to or substantially prejudiced a party."[36]  "We also 'bear in mind at all times that terminating parental rights is a "drastic measure." ' "[37]

"We review de novo the question of whether a judge appears biased, which is assessed under an objective standard."[38]

## IV.   DISCUSSION

Angelica argues that the superior court erred by denying her petition to terminate Jonathan's parental rights.  She contends that the superior court's findings are insufficient because it did not consider each of the best interests factors enumerated in both statutes, and that it abused its discretion by finding that the factors weighed against termination of Jonathan's parental rights.  She also argues that the superior court abused its discretion by failing to give sufficient weight to the legislature's policy decision to

---

[34]     *Ott*, 463 P.3d at 185 (quoting *Sheffield v. Sheffield*, 265 P.3d 332, 335 (Alaska 2011)).

[35]     *Joy B. v. Everett B.*, 451 P.3d 365, 368 (Alaska 2019) (quoting *Hamilton v. Hamilton*, 42 P.3d 1107, 1111 (Alaska 2002)).

[36]     *Ronny M. v. Nanette H.*, 303 P.3d 392, 400 (Alaska 2013).

[37]     *Karrie B. ex rel. Reep v. Catherine J.*, 181 P.3d 177, 184 (Alaska 2008) (quoting *Martin N. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 79 P.3d 50, 53 (Alaska 2003)).

[38]     *Downs v. Downs*, 440 P.3d 294, 297 (Alaska 2019) (quoting *Mengisteab v. Oates*, 425 P.3d 80, 85 (Alaska 2018)).

protect the victims of sexual abuse. Lastly, she argues that the superior court's decision was the product of judicial bias.

> **A. The Superior Court Did Not Err By Denying Angelica's Petition To Terminate Jonathan's Parental Rights.**
>
> > **1. The superior court did not abuse its discretion by finding that it was in J.T.'s best interests to preserve Jonathan's parental rights.**

Angelica argues that the superior court abused its discretion by failing to consider all of the best interest factors enumerated in AS 25.24.150(c) and AS 47.10.088(b). When making a child custody award, courts are required to consider the nine best interests factors listed in AS 25.24.150(c):

> (1) the physical, emotional, mental, religious, and social needs of the child;
>
> (2) the capability and desire of each parent to meet these needs;
>
> (3) the child's preference if the child is of sufficient age and capacity to form a preference;
>
> (4) the love and affection existing between the child and each parent;
>
> (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
>
> (6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child;
>
> (7) any evidence of domestic violence, child abuse, or child

neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

When considering whether termination of parental rights is in a child's best interests in a CINA or adoption case, courts are authorized to consider the five factors enumerated in AS 47.10.088(b):

(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;

(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;

(3) the harm caused to the child;

(4) the likelihood that the harmful conduct will continue; and

(5) the history of conduct by or conditions created by the parent.

"[W]hen determining custody, the superior court is required to consider the nine factors under AS 25.24.150(c), but *it 'need not refer to all of [the factors] in explaining its custody decision'* and may choose to discuss only those factors it finds relevant to the case."[39] "The superior court's findings are sufficient if they provide 'a clear indication of the factors [that the court] considered important in exercising its discretion or allow us to glean from the record what considerations were involved.' "[40]

---

[39] *Schaeffer-Mathis v. Mathis*, 407 P.3d 485, 492 (Alaska 2017) (emphasis added) (alteration in original) (quoting *Rosenblum v. Perales*, 303 P.3d 500, 504 (Alaska 2013)).

[40] *Rosenblum*, 303 P.3d at 504 (alteration in original) (quoting *Ebertz v.*
(continued...)

Similarly, in CINA and adoption cases, the superior court "*may* consider the factors in AS 47.10.088(b) as well as 'any other facts relating to the best interests of the child.' "[41] But "[t]he superior court is not required to consider or give particular weight to any specific factor."[42]  And in *Angelica C.* we directed the superior court to "consider the *relevant* best interests factors enumerated in the custody and adoption contexts."[43]  Thus, as in other types of cases involving a child's best interests, the court presiding over an independent proceeding to terminate parental rights must consider and make findings on only those factors relevant to its decision.

   The superior court made clear written findings about the best interest factors relevant to its decision.  The court considered J.T.'s physical, emotional, mental, religious, and social needs;[44] the capability and desire of both parents to meet those needs;[45] evidence of substance abuse and domestic violence;[46] J.T.'s need for stability;[47]

---

[40] (...continued)
*Ebertz*, 113 P.3d 643, 648 (Alaska 2005)).

[41] *Bob S. v. State*, 400 P.3d 99, 109 (Alaska 2017) (emphasis added) (internal footnote omitted) (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 336 P.3d 1258, 1271 (Alaska 2014)).

[42] *Id.* (quoting *Chloe W.*, 336 P.3d at 1271).

[43] *Angelica C. v. Jonathan C.*, 459 P.3d 1148, 1160 (Alaska 2020) (emphasis added).

[44] *See* AS 25.24.150(c)(1).

[45] *See* AS 25.24.150(c)(2).

[46] *See* AS 25.24.150(c)(7)-(8).

[47] *See* AS 25.24.150(c)(5).

the love between J.T. and his parents;[48] and Jonathan's willingness to facilitate a relationship between J.T. and Angelica.[49] The court mentioned J.T.'s ability to form a meaningful preference, which, given his age and its concern that he had been improperly influenced, it gave "severely limited" weight.[50] It also specifically considered Jonathan's prior conviction for sexual abuse and the fact that he had successfully rebutted the presumption of domestic violence.[51] The superior court sufficiently considered and applied the best interest factors in AS 25.24.150(c).

The superior court also sufficiently analyzed the factors in AS 47.10.088(b). The court noted that many of them did not apply due to the context of the case, but it did consider whether and when J.T. could return to living with Jonathan[52] and that Jonathan had not committed any criminal acts since his release in 2014.[53] The superior court did not abuse its discretion by failing to consider any relevant best interest factors.

Angelica also contends that the superior court erred by failing to consider that Jonathan had never apologized to her for the sexual abuse and that he had neglected to register with Washington's sex offender registry. But neither of those facts are relevant to J.T.'s best interests.[54] Angelica further argues that the superior court erred

---

[48] *See* AS 25.24.150(c)(4).

[49] *See* AS 25.24.150(c)(6).

[50] *See* AS 25.24.150(c)(3).

[51] *See* AS 25.24.150(c)(7), (9).

[52] *See* AS 47.10.088(b)(1).

[53] *See* AS 47.10.088(b)(4)-(5).

[54] In its final order the superior court observed that "[w]hile it is true that the termination of [Jonathan's] rights would be in [Angelica's] best interest, the court cannot
(continued...)

by considering several facts such as the ability of Jonathan's father to parent J.T., Angelica's history of substance abuse, her parents' relationship with Jonathan's family, and the effect termination would have on J.T.'s relationship with his paternal grandparents. However, the court did not directly weigh the ability of Jonathan's father to parent J.T. outside the statutory context of whether J.T.'s current custody arrangement met his physical, emotional, mental, religious, and social needs.[55] Nor did the court weigh Angelica's history of substance abuse apart from noting that it could have been "attribut[ed] . . . to the sexual abuse she experienced." The superior court did observe that Angelica and her parents "have consistently opposed the child having any meaningful contact with the paternal grandparents" and that "removal of the paternal grandparents from the child's life would quite clearly be detrimental to the child." Yet AS 25.24.150(c) allows the court to consider such "other factors that the court considers pertinent" to its best interests analysis,[56] and our direction in *Angelica C.* authorized the court to consider "other factors germane to the child's best interests."[57] The superior court did not abuse its discretion when it considered these factors.

Lastly, Angelica argues that all of the statutory best interest factors favored

---

[54]     (...continued)
conclude that it is in the child's best interests, and that is the standard that the court must and does employ."

[55]     *See* AS 25.24.150(c)(1) (directing court to consider "the physical, emotional, mental, religious, and social needs of the child" in its best interests analysis).

[56]     AS 25.24.150(c)(9).

[57]     *Angelica C. v. Jonathan C.*, 459 P.3d 1148, 1160 (Alaska 2020) ("In sum, when the superior court determines on remand whether it is in the child's best interests to terminate parental rights under AS 25.23.180(c), it should consider the relevant best interests factors enumerated in the custody and adoption contexts, as well as other factors germane to the child's best interests . . . .").

termination of Jonathan's parental rights and that the superior court abused its discretion by concluding otherwise. But we "will not overturn a trial court's finding based on conflicting evidence, and we will not re-weigh evidence when the record provides clear support for the trial court's ruling."[58] Here, the superior court's findings were well supported by the record. We conclude that the superior court properly analyzed the best interest factors, and that it did not abuse its discretion by determining that it was in J.T.'s best interests to preserve Jonathan's parental rights.

> **2.    The superior court did not abuse its discretion by finding that J.T.'s best interests outweighed Angelica's rights as a victim.**

Angelica contends that the superior court did not properly consider and weigh the legislature's policy decision to protect victims of sexual abuse. She asserts that she is unable to heal from her abuse while the custody dispute continues and that the legislature sought to prevent this situation. In *Angelica C.* we acknowledged that "the irrevocable termination of parental rights is normally accompanied by heightened protections for the adverse parent."[59] But we also recognized that "the termination of parental rights procedure at issue here also reflects a choice by the legislature to protect the victims of sexual abuse from being subjected to years-long custody disputes with their assailants," which "militates in favor of weighing the underlying sexual abuse more heavily, and it seems that the victim-parent's rights should receive strong, though not necessarily dispositive, consideration."[60] On remand, we directed the superior court to "carefully analyze[] the best interests factors in light of the legislature's clear intent to

---

[58]     *In re Adoption of Hannah L.*, 390 P.3d 1153, 1156 (Alaska 2017) (quoting *In re Adoption of S.K.L.H.*, 204 P.3d 320, 324-25 (Alaska 2009)).

[59]     *Angelica C.*, 459 P.3d at 1159.

[60]     *Id.*

level the playing field for victims of domestic violence."[61]

The superior court explicitly considered that Angelica and Jonathan "were involved in an inappropriate (and illegal) ongoing sexual relationship that began when she was thirteen and he was nineteen."[62]  The court recognized that Jonathan's abuse of Angelica likely contributed to her history of substance abuse issues and it did not consider her willingness to foster a relationship between Jonathan and J.T.[63]

But the court also observed that the case did "not appear to be a case where the abuser parent is constantly pursuing, pressuring, or pestering the victim parent." Because Jonathan was no longer in Alaska and had contact with J.T. only when he was at Jonathan's parents' home, the court noted that "the amount of day-to-day interaction between [Jonathan and Angelica] is almost (if not completely) non-existent."  The court concluded that "[t]hese facts blunt a central goal of AS 25.23.180, which . . . is to

---

[61]     *Id.* at 1162.

[62]     The superior court also described the sexual relationship between Angelica and Jonathan as being "cooperative" and "consensual."  Such language is both inappropriate and legally incorrect.  At the age of 13 Angelica was incompetent to consent to such a relationship.  *See* AS 11.41.436(a)(1).  Despite the court's inappropriate description of the relationship, its findings and weighing of the relevant best interest factors are nonetheless not clearly erroneous and do not demonstrate an abuse of discretion.

[63]     The superior court interpreted our instruction in *Angelica C.* to prohibit consideration of Angelica's unwillingness to foster a relationship with Jonathan.  In *Angelica C.* we stated that "[o]n remand — if the superior court determines not to terminate Jonathan's parental rights" — it must then determine how to award custody. *Id.* at 1161.  Because the superior court had previously concluded that "Jonathan [had] rebutted the presumption against custody," we directed it to consider the best interest factors anew in any custody decision. *Id.* at 1161-62 n.57.  We did not require the exclusion of that evidence in the termination decision, but it was not error to do so. *See id.* at 1158-60 (explaining how to evaluate best interests in the termination context).

eliminate the reason or need for continual, repeated, day-to-day interaction between the victim parent and the abuser parent." The court found that because J.T. "knows and loves his father . . . it would be detrimental to the child to forever sever this relationship and bond." It therefore concluded that "termination of [Jonathan's] rights would be in [Angelica's] best interest, [but] the court [could] not conclude that it [was] in the child's best interests."

The court's factual findings are supported by the record, and we do "not re-weigh evidence when the record provides clear support for the trial court's ruling."[64] There is no evidence that Jonathan "pestered" or "pursued" Angelica over custody of J.T.; in fact the record demonstrates that Angelica and her parents initiated much of the litigation surrounding J.T.[65] And since he moved to Washington, Jonathan has not sought custody of J.T. and he testified that he was uncertain whether he was in a position to have custody.

The superior court's determination that a central goal of AS 25.23.180 was "to eliminate the reason or need for continual, repeated, day-to-day interaction between the victim parent and the abuser parent" echoes our conclusion that the statute sought to "protect the victims of sexual abuse from being subjected to years-long custody disputes with their assailants."[66] The court acknowledged that "an end to the litigation would promote the . . . central purpose of the statute" and that termination of Jonathan's parental rights might be in *Angelica's* best interests. But the court also recognized our instruction that "the victim-parent's rights should receive strong, though not necessarily

---

[64]    *In re Adoption of Hannah L.*, 390 P.3d 1153, 1156 (Alaska 2017) (quoting *In re Adoption of S.K.L.H.*, 204 P.3d 320, 325 (Alaska 2009)).

[65]    *See Angelica C.*, 459 P.3d at 1152-55.

[66]    *Id.* at 1159.

dispositive, consideration."[67] And it was guided by our holding that "Jonathan is subject to having his parental rights terminated, but only if the superior court determines that it is in J.T.'s best interests to do so."[68] The court carefully weighed all of the best interest factors and the evidence showing that J.T. loved both of his parents. And the court concluded that even though Angelica could benefit from the termination of Jonathan's parental rights "the court cannot conclude that it is in [J.T.]'s best interests, and that is the standard that the court must and does employ."

We conclude that the superior court did not abuse its discretion by finding that J.T.'s best interests outweighed Angelica's rights as a victim. It specifically considered Jonathan's sexual abuse of Angelica and its effect on her and whether termination was warranted to end the protracted litigation. But it also carefully weighed statutory best interest factors and the nature of the litigation over J.T.'s custody. And after weighing all of those considerations, the court concluded that J.T.'s best interests outweighed the need to end the litigation by terminating Jonathan's parental rights.

## B. The Superior Court Was Not Biased Against Angelica.

Angelica's final argument is that the superior court's custody and termination decisions demonstrate that it has been biased against her since 2015. She points to four specific examples: the court's award of sole custody of J.T. to Jonathan's father in 2016[69]; its later award of custody to Jonathan in 2018[70]; its giving "underlying

---

[67] *Id.*

[68] *Id.* at 1158.

[69] *See Angelica C. v. Jonathan C.*, No. S-16434 (Alaska Supreme Court Order Aug. 2, 2017) (citing *Elton H. v. Naomi R.*, 119 P.3d 969, 980 (Alaska 2005) (reversing and remanding award of custody to Jonathan's father).

[70] *Angelica C.*, 459 P.3d at 1154.

legal advice" to Jonathan in its order denying her petition to terminate Jonathan's parental rights[71]; and its conclusion that her substance abuse was related to her sexual abuse rather than Jonathan. Angelica alleges that the court was biased for the first time in her brief, but "because judicial impartiality and the appearance of judicial impartiality are so important in our society" we assume, as we have in previous cases, that the claim of judicial bias is properly before us.[72]

"We have repeatedly held that a party must demonstrate that the court formed an unfavorable opinion of the party from extrajudicial information and that bias cannot 'be inferred merely from adverse rulings.' "[73] And we note that "judicial bias may also arise during the course of judicial proceedings if 'a judicial officer hears, learns,

---

[71] Angelica argues that the superior court gave legal advice to Jonathan by its reference in its order denying termination that if Jonathan "reestablish[ed] himself in Petersburg . . . fairly quickly[,] then there appears to be no reason to believe that he could not successfully parent [J.T.]." These comments were made in the court's analysis of the best interest factor allowing the court to consider "the likelihood of returning the child to the parent within a reasonable time." *See* AS 44.10.088(b)(1). Angelica also seems to assert that the court offered legal advice to Jonathan's father when it observed that termination might not end litigation in the case, given "the strong possibility that [Jonathan's father] may try to litigate any surviving grandparental rights he may have" amounted to legal advice to do just that.

[72] *See Greenway v. Heathcott*, 294 P.3d 1056, 1063 (Alaska 2013) (assuming without deciding that bias raised for first time on appeal was properly before us and noting that "[i]t is not obvious what must be done to preserve for review a claim of judicial bias"). *But see Tillmon v. Tillmon*, 189 P.3d 1022, 1027 n.13 (Alaska 2008) ("We remind pro se appellants that judicial bias should not be inferred merely from adverse rulings, and we reject this putative point of error because [appellant] did not raise it below. . . ." (citing *Anchorage Nissan, Inc. v. State*, 941 P.2d 1229, 1239-40 (Alaska 1997)).

[73] *Downs v. Downs*, 440 P.3d 294, 299-300 (Alaska 2019) (footnote omitted) (quoting *Kinnan v. Sitka Counseling*, 349 P.3d 153, 160 (Alaska 2015)).

or does something intrajudicially so prejudicial that further participation would be unfair.' "[74] Several different judicial officers have been involved in the long running proceedings in this case. Angelica does not argue or present evidence that any one of the judicial officers considered any information in addition to the information provided in connection with the proceedings. Everything that Angelica argues demonstrates bias was "the result of opinions and attitudes formed in court by the evidence that the judge heard."[75] Because the judicial conclusions with which Angelica disagrees were based on the evidence, they are not demonstrations of bias. And although Angelica believes that the court included "underlying legal advice" to Jonathan in its order denying termination, we see nothing improper in the order.

## V.    CONCLUSION

We AFFIRM the superior court order denying termination of parental rights.

---

[74]    *Id.* at 300 (quoting *Brown v. State*, 414 P.3d 660, 661 n.3 (Alaska 2018) (Winfree, J., concurring in part and dissenting in part)).

[75]    *Hanson v. Hanson*, 36 P.3d 1181, 1186 (Alaska 2001).